VERMONT SUPERIOR COURT
Environmental Division
32 Cherry St, 2nd Floor, Suite 303,
Burlington, VT 05401
802-951-1740
www.vermontjudiciary.org



Docket No. 23-ENV-00068

| | |
|---|---|
| Trombley Height Variance Denial | MERITS DECISON |

This is an appeal of a June 8, 2023 decision by the City of Burlington (the City) Development Review Board (DRB) denying Steven and Andrea Trombleys' (Appellants) height variance request for relief from the City of Burlington Comprehensive Development Ordinance's (CDO) 35-foot height maximum to construct a single-family home of up to 60 feet on their property located at 120 Depot Street in Burlington, Vermont (the Property).

The Court and parties conducted a site visit to the Property the morning of November 15, 2024, followed by a one-day merits hearing at the Costello Courthouse in Burlington, Vermont. Appellants are self-represented and participated in the hearing through Steven Trombley. The City participated through Kimberly Sturtevant, Esq. The Commodore Point Condominium Association participated through Hans Huessy, Esq. Interested Persons, Bill and Dianne Pierson, are self-represented and also participated in the hearing.

### Statement of Questions

Appellants filed a Statement of Questions on August 2, 2023, presenting the following five Questions for this Court's review:

> (1) Whether that because of such physical circumstances or conditions, there is no possibility that the property can be developed in strict conformity with the provisions of the zoning regulations and that the authorization of the variance is, therefore, necessary to enable the reasonable use of the property.
> (2) Whether the unreasonable hardship was created by the Appellant.

(3)     Whether that the variance, if authorized, will not alter the essential character of the neighborhood or district in which the property is located, substantially or permanently impair the appropriate use or development of adjacent property, reduce access to renewable energy resources, nor be detrimental to the public welfare.

(4)     Whether the variance, if authorized, [] will represent the minimum variance that will afford relief and will represent the least deviation possible from the zoning regulation and from the plan.

(5)     Whether the City of Burlington should be estopped from applying Section 5.2.6 of its Comprehensive Development Ordinance, as amended.

Statement of Questions (filed on August 2, 2023).

## Findings of Fact

1.   Steven Trombley and Andrea Trombley, who presently reside in Shelburne, Vermont, own real property, consisting of a 0.10-acre lot (4,180 square feet), located at 120 Depot Street in the City of Burlington.

2.   The Property is in the City's Residential Medium Density – Waterfront zoning district (RM-W or WRM), as identified in the CDO.

3.   The Property, which is generally rectangular in shape, fronts only on Depot Street.  The Property is oriented so that its length runs in an approximately northeasterly-southwesterly direction.

4.   Depot Street is located on the western end of the Property.  The southerly side of the Property abuts lands owned by the City.  The northerly and easterly sides of the Property abut land owned by the Commodore Point Condominium Association and the Reef Partnership.

5.   The Property is mostly comprised of lands having an exceptionally steep grade.  Only the most easterly one-quarter of the Property, above the top of the embankment that rises from Depot Street on the east, is generally level.

6.   On June 16, 2021, the Appellants signed a purchase and sale contract to purchase the Property.  The contract included a contingency that Appellants would be able to build the type of home that they were envisioning, aesthetically and structurally, on the lot.

7.   On June 21, 2021, in furtherance of his due diligence obligations under the above-referenced contingency, Mr. Trombley went to the City's zoning offices to discuss his project.

8.   He met with Scott Gustin, the Zoning Division Manager and Chief Assistant Administrative Officer, for the City's Department of Permitting & Inspections (the Zoning Division).

9. Each year, the Zoning Division processes over a thousand applications and Mr. Gustin meets with dozens of people in connection with their proposed projects. The detail and quality of the project plans that he reviews varies greatly.

10. During their June 21 meeting, Mr. Trombley showed Mr. Gustin certain hand-drawn elevation and interior design sketches that he had prepared. Appellants' Ex. H.

11. The sketches depict a unique three-story structure, with two stories of living space elevated by a column above a street-level garage (occupying most of the sloped-portion of the lot). None of the sketches contain a scale or any dimensional information, including elevation or gradient markings. Id.

12. Upon viewing the sketches, Mr. Gustin, who had prior knowledge of and experience working with other parties interested in developing the Property, commented generally to Mr. Trombley that the building depicted in the sketches appeared "appropriate" for the site.[1]

13. The June 21, 2021 meeting between Messrs. Trombley and Gustin was not recorded.

14. Between the end of June and the beginning of August 2021, Appellants worked to complete their due diligence under the purchase and sale contract contingencies. Among other things, they communicated with Zoning Division staff, engaged professional assistance, and applied for a renewed front-yard setback variance to authorize a structure 10-feet from the front property line, which was approved by the DRB on August 4, 2021.

15. In late July 2021, Mr. Trombley asked the City about clearing trees from the Property. By responsive email dated July 21, 2021, Mr. Gustin explained what tree cutting was authorized without a permit under the City's CDO.

16. Appellants ultimately clear-cut the trees on the Property, exceeding the exemptions for cutting without a zoning permit provided in the CDO.

17. Believing they had fulfilled their due diligence obligations, Appellants closed on the Property on August 21, 2021.

18. On or about August 26, 2021, Appellants submitted an incomplete application for a zoning permit to construct a single-family residence on the Property (the 2021 Application).[2] The City made efforts to notify Appellants that the 2021 Application was incomplete.

---

[1] Mr. Trombley testified to and had a clear recollection of Mr. Gustin's comment that the dwelling depicted in the sketches looked appropriate to the site. For his part, Mr. Gustin does not specifically recall what was said during his initial conversation with Mr. Trombley. The Court finds that Mr. Trombley's recollection is credible.

[2] It is unclear from the evidence precisely why the August 26 application was deemed incomplete by the City. However, § 3.2.5 of the City's CDO (last amended April 6, 2022) provides, in part, that "[a]n application for a zoning permit shall not be deemed complete until all submission requirements have been provided to the satisfaction of the administrative officer."

19. Between August 2021 and May 16, 2022, Appellants continued to engage with design and construction professionals, and to work through the City's various utility installation permitting processes.

20. During this time frame, Appellants undertook no actions to remedy the incomplete 2021 Application so that it could be reviewed by the City.

21. On or about May 16, 2022, the City discovered that Appellants had clear cut the Property.

22. On the same day, Appellants submitted a new application for a zoning permit to construct a single-family home at the Property, which the City ultimately combined with their after-the-fact tree removal permit application (the May 2022 Application). Appellants withdrew their 2021 Application.

23. During the nearly one-year period from June 21, 2021, the date that Appellants first contacted the City to discuss their proposed project, until May 16, 2022, the date that they submitted a complete application to construct a residence at the Property, the Covid-19 pandemic was on-going, and Appellants did not believe that there was any particular urgency to move their project forward. The Zoning Division offices were open during this time, however, and in-person meetings continued to occur.

24. After Mr. Trombley's initial meeting with Mr. Gustin in June 2021, Appellants were principally in contact with then-Associate Planner Ryan Morrison regarding the Property, although Mr. Gustin did continue to occasionally meet and exchange emails with Mr. Trombley to answer various questions.

25. By August 8, 2022, after working with City staff to refine their project plans, Appellants understood the May 2022 Application was ready for DRB review.

26. On August 9, 2022, Mr. Morrison alerted Mr. Trombley that Mr. Morrison had become aware of changes to CDO, Article 5, § 5.2.6 that addressed how building height was calculated for properties in the RM-W District.

27. Those changes amended the existing height calculation provisions such that, for any building within 50 feet of the lot's street frontage, building height would be measured from the public way.

28. Under the version of the CDO in effect prior to October 2021, building height was calculated using one of two alternate methodologies that, under certain circumstances, would have allowed building height to be measured starting at the average finished grade within a 10-foot horizontal

4

distance of all exterior walls of the building. Using this methodology, Appellants' proposed project might have complied with the City's height limit.[3]

29. Prior to August 9, 2022, no one from the Zoning Division or the City's Design Advisory Board, with which Appellants had also consulted, had indicated directly to Appellants that the methodology for measuring building height under CDO § 5.2.6 had changed.

30. Unbeknownst to Appellants, the City's Planning Commission (the Planning Commission) had been considering possible CDO amendments, including amendments related to building height measurement methodology under § 5.2.6, at least as early as February 2021.

31. During the winter and spring of 2021, the Planning Commission held a series of meetings on the proposed zoning amendments, culminating in a warned public hearing on June 22, 2021, the day after Mr. Trombley first met with Mr. Gustin.

32. The Planning Commission ultimately approved the amendments and forwarded them to the Burlington City Council, which on or about October 6, 2021, noticed the amendments for public hearing.

33. When proposed amendments are forwarded to the City Council by the Planning Commission, the Council has a year to approve or disapprove the amendments and may make changes to them, per 24 V.S.A. § 4442.

34. After the City Council had noticed a hearing on the proposed amendments, Mr. Gustin sent an email to his staff regarding the pending amendments, noting their review obligations under 24 V.S.A. § 4449(d).[4]

35. Mr. Gustin did not intentionally withhold information from Appellants regarding the proposed amendments. Given where the relevant amendments were in the adoption process in June 2021 (i.e., still before the Planning Commission) and the timing of Appellants' 2021 Application, he did not see an issue with the height of their proposed building until after the Appellants withdrew the 2021 Application and submitted a new application in May 2022.

36. The City Council adopted the proposed amendments on October 25, 2021, and they became effective on November 24, 2021, approximately six months before Appellants submitted the May

---

[3] Appellants' proposed house had a height of approximately 60-feet when measured from the street frontage but may have complied with the 35-foot height limit when measured using the average finished grade. Since neither the 2021 Application nor the version of the CDO in effect at the time of application are before the Court, however, it is impossible (and would be inappropriate) to draw any definitive conclusions regarding whether Appellants' application would have complied with the City's then-effective zoning ordinance relative to building height.

[4] See 24 V.S.A. § 4449(d) (after legislative body has issued notice of its first public hearing on a proposed bylaw amendment, the administrative officer must then apply the proposed bylaws to any application for a period of 150 days).

2022 Application, which is the sole complete application Appellants submitted for their proposed single-family home to the City.

37. Under the version of the CDO in effect at the time that Appellants submitted a complete application to the City, the maximum building height in the RM-W was 35-feet. City's Exhibit 1, Table 4.4.5-3.

38. When Appellants learned of the amendments in August 2022, they discussed their options with City staff and determined to move forward with DRB review of the May 2022 Application to build a single-family residence up to 60-feet tall on the Property, despite a negative staff recommendation based on the non-complying building height.

39. The CDO, § 4.5.5, once contained an exemption from the City's maximum building height allowing the DRB to permit buildings up to 60-feet in the RM-W. That exemption was eliminated by amendment in 2020.

40. On September 7, 2022, the DRB denied the May 2022 Application for failure to comply with the City's 35-foot maximum building height requirement in the RM-W.

41. Appellants did not appeal that denial.

42. City staff had previously indicated to Appellants that "[a] variance for height is unlikely/impossible" to obtain. Appellants' Ex. M.

43. In late February 2023, Appellants applied for a variance (ZP-23-33) from the City's 35-foot maximum height limit, seeking authorization to construct a house with a height not to exceed 60 feet (the Variance Application).

44. By decision dated June 8, 2023, the DRB denied Appellants' Variance Application, concluding that the application failed to meet four of the variance criteria contained in CDO § 12.1.1. Among other things, the DRB concluded that house construction in compliance with the CDO's 35-foot height limit was possible and that the requested variance was not the minimal departure from the regulations that would afford relief.

45. Appellants timely appealed to this Court.

46. In addition to purchasing the property, Appellants have spent approximately $50,000 on engineering, architectural and legal fees to advance their project.[5]

---

[5] There is no evidence in the record regarding the purchase price of the Property.

6

**Discussion**

Appellants present two general arguments on appeal. First, through Questions 1 through 4, they argue that they are entitled to a variance. Second, Question 5 addresses whether the City is estopped from applying amended CDO § 5.2.6 to them.

**1.    Variance[6]**

After Appellants closed their case-in-chief, Interested Party Commodore Point Condominium Association moved under Vermont Rule of Civil Procedure 52(c) for judgment on partial findings arguing that Appellants cannot meet the variance criteria because there are alternate building designs which would comply with the CDO's 35-foot maximum height limit in the RM-W.[7]

Under § 12.1.1 of the CDO and 24 V.S.A. § 4469(a), an applicant must establish at least five criteria for the DRB, or this Court on appeal, to grant a variance request.[8] To obtain a variance, CDO § 12.1.1(b) and 24 V.S.A. § 4469(a)(2) require that a party demonstrate there is "no possibility" that a property can be developed in strict conformity with the provisions of a bylaw. Further, CDO § 12.1.1(e) and 24 V.S.A. § 4469(a)(5) require that a variance, if authorized, represent the "minimum variance that will afford relief" and the "least deviation possible from the zoning regulation." Based on Mr. Trombley's own testimony, and the exhibits he provided, as well as the stipulated exhibits of other parties, it is undisputed that there is a possible building design which would comply with the CDO's height limitations, or would at least be more compliant.[9] In other words, the evidence at trial demonstrated it is possible to develop the property in conformity with the City's height regulations, and that the variance requested (i.e., to construct a house up to 60-feet tall) is not the minimum variance that will afford relief and the least deviation possible from the CDO. Following a brief recess, the Court granted the motion for judgment on partial findings and denied the variance. This required us to answer Questions 1 and 4 in the negative.[10]

---

[6] This limited discussion is provided to memorialize the Court's bench ruling denying the variance.

[7] Attorney Huessy had filed a document entitled "Interested Parties' Motion for Pre-Hearing Ruling" on November 12, 2024, which the Court declined to address prior to trial since the other parties would not have had adequate opportunity for response. Attorney Huessy's verbal motion reiterated some of the same arguments contained in his written filing.

[8] Section 12.1.1 of the CDO includes a sixth variance criteria not found in § 4469(a).

[9] More specifically, during his direct testimony, Mr. Trombley stated that it was "not remotely reasonable" to say that there were no steps in between the 60-foot building height that he had requested and a complying structure; he further indicated that he was aware there is a "middle ground" and that he had presented an "intermediate design" (with a building height under 60 feet) to the City. See also Appellants' Exhibit G; City's Exhibits 7 & 9; Commodore Point Exhibit 3 (depicting complying or more complying structures).

[10] In denying the variance based on an alternate, compliant design, and/or the availability of a more compliant design, we need not answer Questions 2 and 3. Accordingly, those Questions are **MOOT**.

7

**2. Estoppel**

Appellants assert that estoppel should apply in this case because City staff, and Mr. Gustin in particular, never personally notified Appellants of the proposed amendments to the CDO, despite the potential that their proposed project would be impacted by those amendments. Appellants also argue that had they received timely notice of the amendments from the City, they could have declined to purchase the Property or easily could have submitted a complete application before the amendments were warned for hearing before the City Council.

"The doctrine of equitable estoppel precludes a party from asserting rights which otherwise may have existed as against another party who has in good faith changed [their] position in reliance upon earlier representations." In re Langlois/Novicki Variance Denial, 2017 VT 76, ¶ 12, 205 Vt. 340 (citation omitted). The purpose of this doctrine is to "forbid one to speak against [their] own act, representations or commitments to the injury of one to whom they were directed and who reasonably relied thereon." Id. (citation omitted). We apply "great caution when the party against whom estoppel is sought is the government, but when a government agent acts within that agent's authority, it is a defense that must be available." Id. (citation omitted).

A party claiming estoppel has the burden of proving all four of the following elements: (1) the party being estopped knew the relevant facts; (2) the party being estopped intended that their conduct be acted upon; (3) the party asserting estoppel was ignorant of the true facts; and (4) the party asserting estoppel must have relied to his or her detriment on the estopped party's representations. Id. at ¶ 13. Furthermore, when "the party against whom estoppel is sought is the government, the party asserting estoppel must also demonstrate that 'the injustice that would result from denying the estoppel outweighs the negative impact on public policy that would result from applying estoppel.'" Id. (quoting In re Griffin, 2006 VT 75, ¶ 18, 180 Vt. 589.).

Appellants failed to satisfy the second element of estoppel. The Vermont Supreme Court has held that equitable estoppel requires the party to be estopped intend their conduct be relied upon. In re Lyon, 2005 VT 63, ¶20, 178 Vt. 232, 29 (2005) (holding that a Regional Engineer had requisite intent because he informed the permittee of specific steps to be taken, was central to the process as an advisor, and was vested with "authority to issue the permits on behalf of the agency"); In re Langlois/Novicki Variance Denial, 2017 VT 76, ¶ 20, 205 Vt. 340, 349 (2017) (concluding a Zoning Administrator, as an authorized agent of the government, intended to induce reliance when, upon review of relevant materials, he represented no permit was required in two direct conversations with the permittee). Appellants do not contend that they were affirmatively misinformed by the City.

8

Instead, Appellants' estoppel argument relies not on what any individual City employee said, but rather what the Zoning Division failed to say about pending amendments to the CDO.[11]

Appellants argue that the Zoning Division failed to notify them of ongoing efforts to amend the CDO's maximum building height measurement calculation provisions in § 5.2.6(a). Despite it being largely undisputed that the City did not inform Appellants of the amendments either when they were being considered or after they were approved, Appellants have not met their burden of demonstrating that this omission was intentional in any manner. There is no evidence in the record that the failure to inform Appellants of the amendments was done to induce any reliance by Appellants or have them undertake, or decline to undertake, any actions with respect to the project, at any stage.

Instead, the evidence before the Court is specific to the timeline of events and interactions between Appellants and the City. In sum, Mr. Trombley's testimony focused on the June 21, 2021 informal meeting between himself and Mr. Gustin. During the meeting, Mr. Trombley showed Mr. Gustin a hand drawn sketch of the dwelling he sought to build. Appellants' Ex. H. This sketch contained no dimensions, scale, grade, or any other information upon which definitive conclusions could be made. Neither party could recall all the details from this meeting, and it was not recorded, but according to Mr. Trombley, Mr. Gustin commented generally that the building depicted in the sketches appeared "appropriate" for the site. At no point did Mr. Gustin mention that the following day, the Planning Commission would be holding a warned public hearing on proposed amendments to the CDO's height measurement calculation provisions, which may impact how Appellants' project would be reviewed.

After this meeting, Appellants applied for and received a front yard setback variance and shortly thereafter closed on the Property. During this time, no one in the City's Zoning Division notified Appellants of the proposed changes to the CDO despite various interactions with Appellants. Shortly after closing on the Property, Appellants submitted their first zoning application to develop the lot, the 2021 Application. The 2021 Application sat incomplete for over 10 months, despite notification from the Zoning Division of its incompleteness. On October 25, 2021, the City adopted zoning amendments which modified the existing maximum height calculation provisions. This was nearly seven months prior to Appellants submitting the May 2022 Application, the sole complete application submitted at that point to construct a residence at the Property.

---

[11] This decision does not mean that estoppel can never be predicated on a government official's failure to act. See Beebe v. Eisemann, 2012 VT 40, ¶ 17, 192 Vt. 613 (noting that "estoppel-by-acquiescence arises where the party being estopped is silent in the face of a duty to speak.").

Under the amended CDO, Appellants would be unable to construct their preferred building design for the Property, because the maximum height would necessarily be measured from the building's street facing façade. However, under the previous provision, Appellants arguably would have been able to measure from the average finished grade around all exterior walls of the proposed building.[12]

Taken together, the facts of this case simply do not demonstrate an intentional omission by the Zoning Division upon which Appellants could have reasonably relied to their detriment. A Zoning Administrator has no legal duty to make an applicant personally aware of proposed changes to an ordinance.[13] As Mr. Gustin pointed out in his testimony, his department processes over one thousand applications each year. He routinely conducts initial discussions with prospective applicants, such as the one he had with Mr. Trombley on June 21, 2021. The only direct evidence on the issue of intentionality came from Mr. Gustin, who denied any intent to deprive Appellants of information regarding the pending amendments.

To the extent that Appellants assert that intentionality may be inferred in any respect, the Court disagrees. While the timeline of events shows an omission of information that may not have been prudent, there is no evidence or means to infer that the omission was done with the intention that Appellants take any action (or refrain from acting) with respect to their application whatsoever. Instead, the evidence shows that Appellants' 2021 Application sat incomplete for over 10 months and Appellants missed their opportunity to have their rights vest under the previous version of the CDO.[14] This lapse of time and intervening amendment does not give rise to estoppel against the City with

---

[12] The parties dispute whether the project's height would have been allowable under the pre-October 2021 iteration of the CDO. However, because this issue is not determinative of Appellant's estoppel claim, we need not reach any formal conclusions regarding the prior version of the CDO. We solely note that Appellants assert that the proposed residence's height could be measurable from average finished grade.

[13] Unless otherwise set forth in a municipality's bylaws, the mandatory duties of an administrative officer are statutory, as established by Chapter 117 of Title 24. See e.g., 24 V.S.A. § 4448 and § 4449. Chapter 117 also describes certain duties of the administrative officer that are encouraged, but not mandated. See 24 V.S.A. § 4303(26), § 4448(c). Neither the CDO, nor Chapter 117, create a duty in the Zoning Administrator to provide personal notice to an applicant of potential zoning amendments, nor is providing such notice "encouraged" by the statute. While it is true, however, that the Zoning Division was under no legal obligation to make Appellants directly aware of these changes or provide personal notice to them, neither was it legally precluded from alerting them regarding the amendments in some manner. In the Court's view, it would be a best practice for such officers to take reasonable steps to make parties with pending permit applications (complete or incomplete) aware, beyond mere constructive notice, of potential zoning amendments, given the implications those amendments may have with respect to vested rights.

[14] This 10-month delay is further indication that the Zoning Division did not intend to mislead Appellants. After the amendments were first warned for a hearing with the City Counsel, and even after the amendments became effective in November 2021, Appellants' application continued to sit incomplete. It wasn't until August of 2022, when Appellants were ready to submit their (second) application to the DRB, that Zoning Administrator Morrison realized that the application would be subject to the amended calculation provisions. This timeline of events fails to establish conduct which would give rise to an estoppel claim.

10

respect to the Variance Application or otherwise require the City to apply its pre-amendment regulations to Appellants' project. Beebe v. Eisemann, 2012 VT 40, ¶ 16 (plaintiffs cannot rely on the doctrine of equitable estoppel where their own omissions and inadvertences contributed to the problem).

Further, Appellants failed to provide evidence on the fifth element of estoppel, which applies to claims involving government employees. This element requires the party claiming estoppel to prove that the injustice they would incur without the estoppel outweighs the negative impact on public policy if estoppel were to be granted. In re Lyon, 2005 VT 63, ¶23-26. Here, the City pointed to a strong public policy in ensuring that projects are reviewed under the regulations in effect at the time that a complete application is submitted. Appellants did not directly address this issue or provide the Court with an evidentiary basis to conclude that any injustice to them outweighs the City's public policy interests. In their post-hearing filing, Appellants argue that they asked the right questions of Mr. Gustin and relied on the information provided to them. As discussed above, however, Gustin did not misinform Appellants and he had no legal duty to provide personal notice of potential amendments being considered, but not yet adopted. Appellants failure to file a complete application in a timely manner also contributed to the problem here. Thus, the rare circumstances that justify estopping the government have not been demonstrated by Appellants in this case.

To conclude, there is insufficient evidence of any intentional conduct by Mr. Gustin or any other employees in the Zoning Division to misinform, mislead, or conceal information upon which Appellants could have reasonably relied. Absent persuasive evidence of intent to induce detrimental reliance, we are unable to grant the extraordinary relief that Appellants seek, which would be to estop the City from applying its current version of the CDO to Appellant's project. Appellant also wholly failed to address the impact of an estoppel on public policy, as referenced above. For these reasons, Appellants have failed to meet their burden of proving an estoppel claim. This requires us to answer Question 5 in the negative.

**Conclusion**

Based on the factual findings and legal conclusions set forth above, we hereby conclude that Appellants failed to prove that the City should be estopped from applying CDO § 5.2.6 as amended on October 25, 2021. Accordingly, we answer Question 5 in the negative. Furthermore, this Decision incorporates by reference the Court's ruling at the November 15 Merits Hearing, denying Appellants' request for a variance, in which we answered Questions 1 and 4 in the negative. The remaining Questions 2 and 3 became **MOOT** as a result of that ruling.

11

This completes the current proceedings before the Court. A Judgment Order accompanies this Merits Decision.

Electronically signed on November 25, 2024, pursuant to V.R.E.F. 9(d).

Joseph S. McLean
Superior Court Judge
Environmental Division